THE HELEN G. MOSELEY.

MOSELEY et al. v. SLOMAN et al.

(District Court, E. D. New York.   July 10, 1902.)

1. COLLISION—STEAMER AND SCHOONER CROSSING—INEFFICIENT LOOKOUT.
    A collision occurred at sea in the night between a steamer and a
    schooner on crossing courses.  The night was clear, and the wind light,
    but it was shown that the schooner had steerageway, and that her lights
    were burning, and in proper position.  While the evidence was conflict-
    ing as to her course, it gave no reasonable support to the contention
    of the steamer that she was on such a course that her lights could not
    be seen in time to have prevented the collision, although the steamer's
    lookout and three other members of her crew testified they were on the
    watch, and did not see the lights until immediately before the collision.
    *Held* that, under such evidence, the steamer must be held in fault.

In Admiralty.   Suit for collision.

Wing, Putnam & Burlingham, for The Albano.

Carver & Blodgett and William S. Maddox, for The Helen G.
Moseley.

THOMAS, District Judge.   On September 10, 1901, at 1 o'clock
a. m., the three-masted schooner Helen G. Moseley, heavily laden
with lumber, and bound for New York, collided off Tucker's Beach,
N. J., with the steamship Albano, bound, partly laden, for Newport
News.   Thereby both vessels were injured; hence the above actions.
The weather was dark and clear, the sea smooth, and the wind S. W.
by W., or S. S. W., as the steamer claims.   For some time before the
collision, the steamer had been on her proper course of S. W. by S.
The bow of the schooner struck the starboard bow of the steamer, so
that the angle of collision was nearly or quite a right angle.   The
steamer went to port a point or less immediately before the contact,
and for the purpose of avoiding the same.

Without tracing the grounds therefor, the conclusion is reached
readily that the steamer's course was S. W. by S.   Hence, making an
allowance of one point to port for the steamer changing at the moment
of collision, the schooner at the time of contact was heading E. S. E.
If the angle of collision was seven points instead of eight (and the
evidence would justify such inference), the schooner was heading E.
by S., making the above allowance for the steamer's porting.   The
crew of the schooner state that she was headed N. E. by E., that the
steamer's white light, and later her green light, bore three points on
the schooner's port bow, and that the steamer did not change her
course.   With such heading of the schooner and bearing of the steam-
er (1) the accident could not have happened; (2) the red light, and
not the green light, of the steamer should have appeared.   The
schooner's crew emphasize the presence of the steamer's green light,
and its bearing as given.   If the steamer headed S. W. by S., and
her green light bore as stated, the schooner could have headed E.
N. E.   But from a given heading of E. N. E. for the schooner, two
conclusions follow:   (1) The schooner should have seen both lights

of the steamer; (2) the angle of collision should have been no more than four points, making allowance for the steamer's porting as above. But it already appears that the angle of collision was at least seven points, and the evidence does not permit departure to the eastward from such a finding. Therefore, making allowance for the steamer's porting one point, and assuming the angle of collision as seven points, the schooner's heading must have been E. by S. The schooner could have been headed E. by S., and still have been so related to the steamer as to see the latter's green light three points on her port bow, and her red light shut out. This conclusion harmonizes with the schooner's evidence, except as to her heading. Therefore, the facts are: The schooner should have been heading about N. E. by E. for her proper course, whereby the wind, if S. W. by W., would have been dead astern, but she was in fact heading as far south as E. by S., which brought the wind four points abaft the beam. With this heading she could have been sailing winged with her mainsail to port and her mizzen sail to starboard. Yet this was to her disadvantage by several points. The steamer was sailing S. W. by S., and at the time of the collision the schooner was headed E. by S., or E. S. E., or E. S. E. one-half S. The green light of the steamer bore three points from the schooner's port bow, and was visible, but the steamer's red light was shut out. The wind had been very light, and it appears from the argument of the learned proctor for the steamer that "at over sixteen hours before the collision the Moseley was less than fifteen miles distant from the point where it occurred." Nevertheless, the evidence of both parties shows that at the time of the collision the schooner had steerageway. But if the heading of the schooner was E. by S., her red light should have been seen by the steamer. The evidence is that the lights were large, of good make, well cared for, and properly burning. What excuse had the steamer for failing to see the same? The bridge of the steamer was 170 feet aft the stem. A competent seaman was at the wheel. On his port side was a boatswain, and on the starboard side the second officer. The captain had been absent from the bridge about five minutes before the collision. On the forecastle head, and about 47 feet aft of the stem, was a lookout. The men on the bridge and the lookout testify that they were keeping watch, and that the red light of the schooner did not appear until less than a minute before the collision, when all four of the steamer's crew, as just mentioned, saw the red light, which to them appeared small and dim, and about one ship's length off. The wheel was put hard astarboard; the boatswain and second officer assisting the wheelman thereto. The captain, attracted to the bridge, gave the signal to stop, and go full speed astern, which order was executed by the engineer. Hence, four suitable men in the positions stated claim to have been looking forward and around for lights, yet each testifies that he did not see this light until the moment named. But the light existed, it was uncovered, and was sufficiently bright to have been seen for 10 minutes before the collision. What is the explanation?

The steamer urges that the failure to see the light was "due to the schooner having been off her course, so that the steamer was ap-

proaching abaft the range of her lights, until a slant of wind or a freshening land breeze brought the schooner far enough around to the east to show the steamer her regulation side light." As has already been seen, the schooner was headed E. by S., or, if the angle of collision be regarded as a right angle, the schooner's heading would be E. S. E.; or if it be considered that the steamer did not go to port more than half a point, the schooner's heading was E. S. E. one-half S. There is no reason why the light should not have been seen, even in the last-named position. The second officer of the steamer states that when he first saw the schooner she was heading S. E. by S. But he saw her. He also testified that the wind was S. S. W. This alleged heading of the schooner S. E. by S. would have brought the wind three points forward of the beam, with the mizzen sail winged to starboard; in any case a highly improbable, if not impossible, relation to the wind on the part of a vessel having steerageway and bound for New York. But there is not the slightest reliable evidence in the case that the schooner was on a course of S. E. by S., or even S. E. The evidence, even of the master of the steamer, is that the schooner had steerageway. Whether the wind be regarded as S. S. W., as the steamer claims, or S. W. by W., as the schooner claims, there would be only gross unreason in such alleged heading of the schooner. The angle of collision shows that such was not her heading. The evidence of the schooner's crew, although not adopted fully on this subject, places her heading at N. E. by E. With the wind S. S. W., she could not have been sailing winged on the course claimed for her by the steamer. But it is necessary to adopt this theory in order to exculpate the steamer for her failure to see the red light. Therefore, the question is whether a supposition that has not sufficient support from the evidence should be adopted, because it would, if true, relieve persons who should have seen a light from a failure therefor. It is not the province of the court to find theories, but facts. There is no doubt that the steamer was employing a suitable lookout, and that her men on watch were using a fair degree of care, but had they exercised requisite care, no reason for their failure to discover the existing red light of the schooner is shown. At least the evidence gives no satisfactory explanation. The case is peculiar. It may be that the absolute truth is with the steamer, but the question here is, what does the evidence show? It certainly does not show the schooner with her head turned so far to the southward as to hide her port light.

There must be a decree in favor of the schooner and against the steamer.